UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) ) ) ) v. ) ) JESUS GONZALEZ, ) ) Defendant. ) ) ) | Criminal No. 16-10178-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.** February 2, 2017

**I. Introduction**

Defendant Jesus Gonzalez ("Gonzalez") has moved to suppress the evidence seized from his arrest, pursuant to an arrest warrant obtained on June 6, 2016, and the evidence seized from the search of his residence pursuant to a search warrant obtained on June 7, 2016. D. 44; D. 45-1 at 65. Having considered the motion (and supporting memorandum and exhibits), D. 44-45, the government's opposition, D. 49, and having heard oral argument on the motion, D. 52, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

**II. Findings of Fact**

These findings are based upon the record before the Court including but not limited to the Affidavit of Task Force Officer David J. Spirito ("Spirito") filed on June 6, 2016 in support of the arrest warrant and criminal complaint for Gonzalez, D. 45-1 at 6-14, and the Spirito affidavit filed on June 7, 2016 in support of the search warrant for Gonzalez's residence at 39 Greenville Street

1

in Haverhill (the "Greenville Street residence"), D. 45-1 at 21-38; the transcript of Gonzalez's detention hearing on June 16, 2016, D. 45-2, and Gonzalez's affidavit, D. 45-3.

### A. The Confidential Witness and Gonzalez

In November 2015, investigators interviewed a confidential witness ("CW") who was awaiting trial in New Hampshire for certain drug crimes. D. 45-1 at 9-10. The CW had no other criminal record aside from motor vehicle violations. Id. The CW provided information in an effort to influence his pending criminal charges and indicated that he was willing to testify in future criminal proceedings. Id. As Spirito also disclosed in his affidavit, the CW, while cooperating with law enforcement, continued to purchase certain controlled substances from Gonzalez which were not controlled by, sanctioned by or reported to the law enforcement officers. Id. at 10.

In the course of his cooperation with agents, the CW stated that he had purchased heroin and other controlled substances from an individual he identified as "G." Id. The CW described this person as a distributor of oxycodone and heroin and as residing in the Lawrence area. Id. The CW shared a photograph of "G" that he had obtained from a social media website with the agents. Id. Comparison of this photograph with Massachusetts RMV records confirmed that the individual CW identified as "G" possessed a Massachusetts driver's license bearing the name of Jesus Gonzalez. Id. The CW gave the agents the current and previous telephone numbers for Gonzalez and indicated that he had been purchasing oxycodone and heroin from Gonzalez since 2014. Id. He also indicated the Gonzalez frequently changed phone numbers. Id.

The CW disclosed that he contacted Gonzalez through phone calls and text messages using the telephone number (978) 539-9025 to oxycodone and heroin. Id. The CW allowed investigators to examine and download the contents of his cellular telephone. Id. Examination of the CW's phone confirmed calls and text messages between the CW's phone and Gonzalez's phone number. Id.

For example, the text messages included an exchange between the CW and Gonzalez following a drug transaction which had occurred on October 17, 2015. Id. at 11. The CW indicated to the investigators that he had agreed to purchase a certain amount of alprazolam pills and heroin from Gonzalez—where an unknown party delivered the drugs on that date— but that he did not receive the correct amounts. Id. The text messages addressed this issue. Id. at 11-12. The text messages also included an exchange regarding the CW's purchase of heroin from Gonzalez on November 19, 2015. Id. at 13. The text exchange included details regarding the 250 grams of heroin to be purchased. Id. The CW's recounting of this transaction was corroborated as the CW had been arrested that same evening in possession of 230 grams of heroin and it was following that arrest that the CW agreed to assist the investigators by making a controlled purchase of narcotics from Gonzalez. Id.

### B. December 2, 2015 Controlled Purchase

On December 2, 2015, investigators had the CW arrange to purchase 200 grams of heroin from Gonzalez and the investigators observed and recorded all the calls and text messages between CW and Gonzalez regarding the purchase. Id. at 13. During the text exchanges and phone calls to arrange the transaction, Gonzalez, using coded language, asked the CW if he wanted to purchase 300 grams of heroin and he also reminded the CW that he owed him $5,500 for the 55 grams the CW had previously purchased on credit. Id. at 14, 15-16.

By phone, the CW and Gonzalez eventually agreed on a time to meet for the purchase and the agents outfitted him with a transmitter and recording device. Id. at 15. The agents provided him with buy money ($7000) and searched the CW's person and vehicle for contraband and weapons, finding none. Id. Agents then established surveillance of the 200 High Street area in Lawrence, the location that the CW had reported was the one that they commonly used to conduct their drug transactions. Id. at 16. The agents were able to monitor the conversation in which

3

Gonzalez told the CW to "come to High" and the CW arrived near 200 High Street. Id. at 16. The CW met with the person he later identified as Gonzalez. Id. at 17 & n.2. While the surveillance agents were able to monitor some of the conversation the CW had with the male, they were unable to see the individual in their surveillance. Id. An agent performing surveillance on the area observed the passenger side of the CW's vehicle open and a male exit and then enter another vehicle and depart. Id. The CW later confirmed that the male was Gonzalez and provided the agents with a clear plastic bag with several individual packages suspected to be heroin. Field testing later indicated that the packages contained approximately 191 grams of fentanyl, not heroin. Id. at 17-18.[1]

### C. Further Investigation of Gonzalez

In April 2016, several months after the December 2, 2015 controlled purchase, agents set up a pole camera in the area of 145 High Street in Lawrence. Id. at 18. This area was in the general location of the December 2nd controlled drug purchase. Id. In addition to the pole camera surveillance, agents also conducted physical surveillance in this location numerous times after April 2016. Id. Identifying Gonzalez by comparison to his driver's license photograph, agents, on physical surveillance and via the pole camera, observed Gonzalez at that location "on an almost daily basis." Id. United States Postal Service records indicated that Gonzalez received mail at the Greenville Street address, not the 145 High Street address. Id. During the course of the investigation, agents had also observed Gonzalez at the Greenville Street residence on numerous occasions.

---

[1] This was not the first time that the CW had received drugs different that he had ordered from Gonzalez. In a prior transaction on October 17, 2015, the CW had arranged to buy 250 grams of heroin and 50 alprazolam pills from Gonzalez, but did not get the right amount of heroin (225, not 250, grams) or any of the pills from Gonzalez. D. 45-1 at 11. Text messages that the CW shared with the law enforcement agents concerned the discrepancy between the negotiated amounts and the delivered amounts of drugs. Id.

4

### D. Agents Seek An Arrest Warrant for Gonzalez and then a Search Warrant for the Greenville Street Residence

On June 6, 2016, Spirito filed an affidavit in support of criminal complaint charging distribution of heroin and fentanyl and arrest warrant for Gonzalez. Id. His affidavit recounted the facts summarized above along with a recitation of his law enforcement training and experience in investigating drug-related crimes. Id. at 6-9. The Court (Dein, J.) issued the complaint and arrest warrant. D. 45-1 at 36. Agents arrested Gonzalez the next day on June 7, 2016 while driving a Mercedes Benz E350 that was registered to his uncle. Gonzalez had been seen driving the Mercedes numerous time by agents investigating the case, admitted he frequently drove a Mercedes and indicated his address as the Greenville Street residence, Apartment 2. Id. at 37.

Later that day, Spirito filed an affidavit in support of a search warrant to search Gonzalez's Greenville Street residence. D. 45-1 at 21. Spirito attested, based upon his training and experience, how, among other things, drug and money laundering operations operate and how certain drug-related evidence, such as drugs, money cellphones, tools of drug distribution and drug records, are typically recovered from the residences or secure locations controlled by drug traffickers. Id. at 21-35. In this affidavit, Spirito also incorporated his June 6th affidavit in support of the criminal complaint and arrest warrant along with additional information about Gonzalez's arrest and the Greenville Street residence. Id. at 36. Specifically, the agent attested that U.S. Postal Service records confirmed that Gonzalez received mail at this address and that his name was written on a piece of paper, along with three other names, attached to the mailbox for this residence. Id. Surveillance had observed Gonzalez at the Greenville Street residence on numerous occasions during the course of the investigation. Id. at 36-37. On the day of his arrest, agents had observed him arrive at the residence driving a gray Mercedes Benz with Massachusetts registration TC54FL, registered to his uncle, Joes Ramirez Paulino of Lawrence. Id. at 37. Agents had observed

Gonzalez driving this vehicle on numerous occasions since November 2015 and had observed this vehicle at the Greenville Street residence on numerous occasions in the same time frame. Id. at 37.

Spirito also reported in this affidavit that, in October 2015, investigators had interviewed another source of information who identified Gonzalez as a mid-level drug trafficker from Haverhill, Massachusetts who drove a gray Mercedes Benz bearing the registration TC54FL, registered to someone other than Gonzalez. Id. at 37.

The Court (Dein, J.) issued the search warrant for the Greenville Street residence. The subsequent search of the Greenville Street residence uncovered, among other things, over $64,000 in cash, a money counter and a scale in a bedroom determined to be Gonzalez's. D. 45-1 at 90-91. The search also uncovered a number of cellphones along with papers with names and numbers appearing to concern drug transactions in a second bedroom determined to be that of Gonzalez's uncle. Id.; D. 45-2 at 13.

**III. Discussion**

    **A. Probable Cause Standard**

The Fourth Amendment requires probable cause for issuance of an arrest warrant or search warrant. Whiteley v. Warden, 401 U.S. 560, 564 (1971). This standard requires a showing of "a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). Sufficient information must be presented to the magistrate issuing such a warrant to allow her to determine independently whether probable cause exists. Id. at 239. In reviewing the adequacy of probable cause for a warrant, a reviewing court is "tasked with making a judgment based on what appears within the four corners of the affidavit." United States v. Tanguay, 787 F.3d 44, 53 (1st Cir. 2015). It is well settled that there

is "'a presumption of validity with respect to the affidavit supporting the search warrant.'" United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)). Accordingly, a reviewing court should give "great deference" to the magistrate's determination of probable cause. Spinelli v. United States, 393 U.S. 410, 419 (1969).

Where a defendant challenges the legality of a search conducted pursuant to a search warrant, he bears the burden of showing by a preponderance of the evidence that the search was unlawful. United States. v. Legault, 323 F. Supp. 2d 217, 220 (D. Mass. 2004); see United States v. Burdulis, No. 10-40003, 2011 WL 1898941, at *3 (D. Mass. May 19, 2011) (citing cases). The issue for the reviewing court is whether "the totality of the circumstances" in the affidavit afforded the clerk magistrate a "substantial basis for determining the existence of probable cause" for the search. Gates, 462 U.S. at 238. A reviewing court "must examine the affidavit in a practical, commonsense fashion" and "accord considerable deference to a magistrate's determination that information in a particular affidavit establishes probable cause." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (internal quotation marks and citation omitted).

**B. Probable Cause Existed for the Issuance of the Arrest Warrant**

The crux of Gonzalez's challenge to the probable cause for the issuance of the arrest warrant was that there was insufficient showing within the four corners of the Spirito affidavit that there was probable cause to believe that Gonzalez had a crime, namely drug distribution. The Court disagrees.

The affidavit, submitted to the magistrate judge in support of the arrest warrant, demonstrated probable cause for Gonzalez's arrest on drug distribution charges. In relevant part, the Spirito affidavit recounted the information about Gonzalez's past drug dealings from CW, the corroboration regarding this information, the recorded conversations and texts in which the CW

7

set up a further controlled purchase of drugs from Gonzalez and the circumstances of the controlled buy itself on December 2, 2015. Gonzalez challenges the reliability of the CW's information about his past purchases of oxycodone and heroin allegedly from Gonzalez or that the December 2nd purchase was from Gonzalez, suggesting that the CW's interest in assisting law enforcement for favorable consideration in his own criminal case makes him an unreliable source. Where a probable cause showing relies, even in part, on a confidential source's information, the Court looks to a non-exhaustive list of factors to assess the reliability of same: the probable veracity and basis of knowledge of persons supplying the information; (2) whether the informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated "wherever reasonable and practicable"; and (4) whether the agent affiant "assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information." United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011). Much of Gonzalez's argument ignores the independent corroboration, cited in the Spirito affidavit, of the agents' review of the CW's contemporaneous calls and texts with Gonzalez about those prior transactions and the fact of the CW's arrest on the heels of one of those prior buys from Gonzalez. As to the December 2nd transaction, although it was fully disclosed in the affidavit that the agents could not identify Gonzalez from their physical surveillance that day, the CW, having previously done business with Gonzalez first-hand, did so and the agents also listened to the (partial) recording and prior texts and calls with Gonzalez which served to corroborate same. Based upon the totality of circumstances recited in the Spirito affidavit, there was probable cause for the issuance of the arrest warrant for Gonzalez.

**C. Probable Cause Existed for the Issuance of the Search Warrant**

Gonzalez challenges the probable cause for the issuance of the search warrant on two grounds. First, he contends that the location where the search was to be conducted was not identified with particularity. Second, Gonzalez argues that the Spirito affidavit did not establish a sufficient nexus between the articles to be seized and the place to be searched, the Greenville Street residence.

*1. Particularity of the Search Warrant*

The Fourth Amendment requires that a search warrant "must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted). The place to be searched must be identified with "particularity." The "test for determining the adequacy of the location to be searched is whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might mistakenly be searched.'" United States v. Bonner, 808 F.2d 864, 866 (1st Cir. 1986) (quoting United States v. Turner, 770 F.2d 1508, 1510 (9th Cir. 1985)).

The search warrant identified the place to be searched with particularity. The Spirito affidavit described the premises in accurate detail as "39 Greenville Street, Haverhill, MA 01832, a three-story residence, with light gray siding, a grey roof and dark trim. The number '39' is attached to the awning above the front door of the building. The front door to the apartment is white, and is located at the top of a staircase." D. 45-1 at 39. The affidavit also attached and incorporated a photograph of the residence and the front door of the apartment and both were consistent with the written description. D. 45-1 at 39-40. Given these descriptions, the location

to be searched was identified with sufficient particularity to allow the agents executing the search to locate and identify the premises to search and reasonably avoid any possibility of searching another premises by mistake.

### 2. Nexus Requirement for the Search Warrant

The warrant application also satisfied the "nexus" requirement: that there was probable cause to be believe that a crime had been committed (i.e., drug distribution) and that enumerated evidence of that offense would be found at the place to be searched (i.e., the Greenville residence). United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009).

In his motion to suppress, Gonzalez points out that the December 2nd controlled buy was not at the Greenville Street residence and, even according to the CW, his past drug transactions with Gonzalez were not at this location. Moreover, although the police surveillance connected Gonzalez and the Mercedes that he drove to the Greenville Street address, such surveillance did not reveal drug distribution or other suspicious behavior at this location. Law enforcement agents, however, had sufficient information (both through their surveillance, but also Gonzalez's post-arrest statement during booking), recited in the Spirito search warrant affidavit, that Gonzalez resided at the Greenville Street residence. That there was no evidence presented that Gonzalez conducted any drug transactions at his residence does not mean that there was no nexus between his alleged drug dealing and his residence. The requisite nexus between enumerated evidence of the crime and the place to be searched need not be express evidence of same, but "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." Ribeiro, 397 F.3d at 49 (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)); Feliz, 182 F.3d at 88. This is particularly true where the Spirito affidavit also included a recitation of the agent's

experience as to the investigation of drug trafficking and experience that evidence of drug dealing (not just controlled substances, but money, cell phones, addresses and phone numbers and records of transactions) is often kept close at hand (for instance, at a residence), D. 45-1 at 25-26, 28, even while drug transactions may be conducted elsewhere. A magistrate may rely upon such information, along with the totality of the circumstances, in concluding that the nexus requirement has been satisfied. Feliz, 182 F.3d at 87; United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997). The Court concludes that this is what was properly done in this case.

### D. Leon Good Faith Exception to the Exclusionary Rule Would Apply

Even if probable cause had not been shown here, the good faith exception under United States v. Leon, 468 U.S. 897, 926 (1984) would, as the government argues, preclude suppression of the evidence here.

The touchstone of the exception is that law enforcement officers are entitled to reasonable reliance upon warrants duly issued by a court. Id. at 922. In the absence of any allegation that the magistrate judge was misled by information that the affiant provided that was false or that he would have known to be false but for his reckless disregard for truth, that the magistrate judge abandoned her detached and neutral role in issuance, that the affidavit was so lacking in indicia of probable cause that reliance upon it was unreasonable or that the warrant was so facially deficient that the agents could not have reasonably concluded that it was valid, the exception applies. Id. at 926; United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999). With no such allegations here, even if probable cause for the warrants was lacking (which the Court has concluded it was not), the suppression of evidence that Gonzalez seeks would not be warranted.

### IV. Conclusion

For all of the aforementioned reasons, Gonzalez's motion to suppress, D. 44, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
                                                                United States District Judge